## S06A1442. CASON v. CASON.
### (637 SE2d 716)

THOMPSON, Justice.

A final judgment and decree of divorce was granted to appellant Rickey Alan Cason ("husband") and appellee Betty Jean Brown Cason ("wife") in 1995. Through 2004, husband was a chicken farmer and a shareholder/member of the Gold Kist Cooperative. As part of his membership in the cooperative, husband was allocated a portion of the cooperative's earnings for each year of his membership.[1] The final decree incorporated a settlement agreement which provided in pertinent part that the equity in the marital home amounted to $125,000, that wife's share was $62,500, but that wife would relinquish her share of the equity and allow husband to continue to reside there. In consideration therefor, she would receive "the entire Gold Kist Patron Dividends payment from 1987 through 1993." Historically, patronage equity credits listed in a member's patronage equity account had been redeemed by Gold Kist and paid in cash, but such payments were made approximately 15-25 years in the future. Thus, the parties contemplated that the 1987 patronage equity listed in the account held in husband's name would be paid by Gold Kist in 2007, and so on for the rest of the patronage equity to be received by wife in the divorce settlement. An exhibit to the agreement, entitled "patron equity report," showed that husband's expected distributions for those years amounted to $150,027.52.[2] Husband was to receive any Gold Kist equity distributions made beyond 1993.

---

[1] The typical cooperative system of allocating and remitting earnings to its members operates as follows:

> Statutes regulating the structure of cooperative associations and bylaws of such associations frequently provide for the retention by the association of all or a portion of the operating profit of the association to furnish capital for the association. In evidence of this, each member of the association is credited with his or her proportionate part of the profit on the books of the association, and is generally issued a certificate showing the credit. This plan is known as the revolving fund plan, or equity plan, and the credits are known as equity credits or patronage credits. These credits are in effect the capital of the cooperative, and raising capital in this way is the most equitable means by which a cooperative can acquire its capital from its patrons. The capital secured through such an equity plan is comparable to the earned surplus of a conventional business organization. Equity credits are not an indebtedness of a cooperative that is presently due and payable to the members, but represent an interest that will be paid to them at some unspecified later date, to be determined by the board of directors. The interest becomes vested only if the board of directors, following the bylaws, exercises its sound discretion in determining that such payments can be made without causing undue financial hardship to the association.

(Footnotes omitted.) 18 AmJur2d, Cooperative Associations § 20 (2006).

[2] Although husband argues that the use of the word "dividends" in the settlement agreement evinces an intent that wife would receive only cash payments made by the cooperative, we adopt the trial court's interpretation that "this was an equity account per the exhibit that was attached to the agreement."

In 2004 Gold Kist converted from a cooperative to a for-profit corporation at which time the equity position held by husband was converted to cash and common stock. Wife requested that husband deliver to her the cash and common stock attributable to the years 1987 through 1993 in lieu of her interest in the patron equity account for those years as set forth in the agreement. When he refused to do so, she filed a petition for contempt.

The trial court declined to find husband in wilful contempt but ordered that he deliver to wife a sum of cash and Gold Kist stock in lieu of her interest in the patron equity account for the years in question, based upon a formula that the court applied. The court also awarded attorney fees to wife resulting from husband's "stubborn litigiousness." We granted husband's application for discretionary review.

We agree that wife was entitled to the shares of stock and cash as determined by the trial court; however, we remand as to the issue of attorney fees for an explanation of the statutory basis for the award and any findings necessary to support it.

1. Husband contends that the trial court improperly modified the final decree by awarding wife stock and cash when the decree provides for the payment of "Gold Kist patron dividends."

> A court may not modify a previous decree in a contempt order. [Cit.] However, a court may always interpret and clarify its own orders. [Cits.] The test to determine whether an order is clarified or modified is whether the clarification is reasonable or whether it is so contrary to the apparent intention of the original order as to amount to a modification. [Cit.] "The trial court has the power to see that there be compliance with the intent and spirit of its decrees and no party should be permitted to take advantage of the letter of a decree to the detriment of the other party." [Cit.] The trial court in a contempt case has wide discretion to determine whether his orders have been violated. His determination will not be disturbed on appeal in the absence of an abuse of discretion.

*Kaufmann v. Kaufmann*, 246 Ga. 266, 268 (3) (271 SE2d 175) (1980). See also *Smith v. Smith*, 281 Ga. 204 (636 SE2d 519) (2006); *Kirkendall v. Decker*, 271 Ga. 189 (516 SE2d 73) (1999); *Perry v. Perry*, 265 Ga. 186 (3) (454 SE2d 122) (1995).

Thus, we look to the nature of the asset the trial court awarded to wife to determine whether it is equivalent to the asset the parties bargained for in their divorce proceedings. If it was in essence the same asset, the court did not improperly modify the terms of the

agreement, but merely construed the relevant provision to determine the intent of the parties when they entered into the original contract. Conversely, if the court used the contempt proceeding to substantially alter the final decree, it amounted to an unauthorized modification.

Wife was entitled to receive the value of the equity account for the years 1987 to 1993 as consideration for the relinquishment of her interest in the real estate. In *McClelland v. Corbitt*, 241 Ga. 244 (244 SE2d 845) (1978), wife was awarded an automobile in a divorce action, but before her former husband transferred the asset to her, it was damaged in an accident. Husband collected and retained the insurance proceeds and then transferred the certificate of title to her. Wife brought a contempt action, demanding that she receive the insurance proceeds in lieu of the damaged automobile. The trial court agreed and held husband in contempt. This Court affirmed, holding that the insurance proceeds are a part of the " 'right, title and interest in and to' the automobile within the meaning of the decree." Id. Similarly, the trial court in the present case was authorized to trace the value of wife's interest in the equity accounts for the years 1987 to 1993, to the stock and cash which husband received in lieu thereof when Gold Kist converted to a publicly held company in 2004. The court's determination was a reasonable clarification because it was consistent with the intent and spirit of the final decree. *Kaufmann*, supra at 268 (3). To rule otherwise would leave wife with an illusory or meaningless asset.

2. Husband further asserts that even if the trial court's interpretation of the agreement is correct, its calculation of the damages is not.

In essence, the trial court reasoned that despite the elections husband made at the time of Gold Kist's conversion to a publicly held corporation, wife was entitled to take her patronage dividends entirely in shares of stock, subject to a mandatory five percent cash payment imposed by Gold Kist, rather than in proportion to the relative amounts of stock and cash that husband elected to receive in the redemption.[3] Under this rationale, the trial court concluded that wife was due $5,656 in cash and approximately 13,125 shares of

---

[3] The portion of the equity account for the year 1987 was characterized as "Qualified Patron Equity"; members were not permitted to convert qualified equity into cash, but must receive stock. The remaining years (1988 to 1993) were characterized as "Non-Qualified Patron Equity"; there was a mandatory five percent cash conversion of non-qualified equity, which in this case, totaled $5,655.75. In making his elections during the conversion, husband requested a maximum amount of cash rather than a maximum amount in stock. As a result, he received $72,639.68 in cash, and 17,425 shares of common stock in Gold Kist, Inc. Husband sold approximately one-half of the shares he was issued at a price of slightly more than $18 per share, and at the time of trial he had 8,714 shares remaining.

stock. Since husband only held 8,714 shares as of the date of trial, the court required that he compensate wife in cash for the remaining 4,411 shares due to her, at the highest market price per share during the period husband was permitted to sell any of the shares until the date of the trial court's order, or $21.99 per share. At this price, husband was ordered to pay wife $96,991 for the stock he sold, in addition to the $5,656 in cash, and remit to her the 8,714 shares he continued to hold.

The trial court based its award on OCGA § 44-12-152. This Code section determines the value of personalty recoverable in a trover action and typically allows a plaintiff to recover "a sum in the amount of the highest value which he is able to prove existed between the time of the conversion and the trial." OCGA § 44-12-152. "Personalty" includes shares of stock, such as those in issue here. OCGA § 44-1-3; *Hamil v. Flowers*, 133 Ga. 216 (65 SE 961) (1909).

Where a defendant's possession of the property was lawfully acquired, a plaintiff in a trover action is required to show either actual conversion or a demand for return of the property coupled with the defendant's failure or refusal to return the property, i.e., constructive conversion. *McDaniel v. White*, 140 Ga. App. 118 (2) (230 SE2d 500) (1976). Though not specifically pled by wife, the underlying basis of her contempt petition was essentially a trover action, in which she alleged constructive conversion, i.e., wife demanded that husband deliver to her the cash and stock he received in the Gold Kist redemption for the patronage equity attributable to the years 1987 to 1993; that she had a right of possession in those assets based on the divorce decree; and, husband failed to deliver the requested funds and stock. The trial court correctly applied OCGA § 44-12-152 and awarded wife an amount determined based on the highest market value of the Gold Kist stock between the time it was eligible to be sold by husband and the time of trial.

3. Husband asserts that the trial court erred in its award of attorney fees to wife. After deeming the relevant provision of the settlement agreement to be unambiguous, but refusing to find husband in wilful contempt, the trial court went on to order husband to pay wife $11,803 in attorney fees due to husband's "stubborn litigiousness."

Generally an award of attorney fees is not available unless supported by statute or contract. *Cary v. Guiragossian*, 270 Ga. 192 (4) (508 SE2d 403) (1998); *Walker v. Walker*, 266 Ga. 414 (1) (467 SE2d 583) (1996). OCGA § 19-6-2 authorizes a court, within its discretion, to award attorney fees in a contempt of court action arising out of a divorce case; however, the court is to consider the financial circumstances of both parties in assessing such an award. See OCGA § 19-6-2 (a) (1). "[A]n award under OCGA § 19-6-2 depends on the

financial circumstances of the parties, not their wrongdoing," *Williams v. Cooper*, 280 Ga. 145, 147 (1) (625 SE2d 754) (2006); it is to be made with the purpose of ensuring effective representation of both spouses in an action arising out of a divorce. *Johnson v. Johnson*, 260 Ga. 443 (396 SE2d 234) (1990).

Alternatively, OCGA § 9-15-14 (b) authorizes a court to award attorney fees if it finds that a party "brought or defended an action, or any part thereof, that lacked substantial justification or . . . was interposed for delay or harassment, or if it finds that . . . [a] party unnecessarily expanded the proceeding by other improper conduct." An order awarding attorney fees under OCGA § 9-15-14 must include findings of conduct that authorize the award. *Porter v. Felker*, 261 Ga. 421 (3) (405 SE2d 31) (1991).

Here, the trial court failed to make findings sufficient to support such an award under either section. Thus, the issue of attorney fees must be remanded for an explanation of the statutory basis for the award and any findings necessary to support it. *Moon v. Moon*, 277 Ga. 375 (6) (589 SE2d 76) (2003).

*Judgment affirmed and case remanded with direction. All the Justices concur.*

DECIDED NOVEMBER 20, 2006.

*Candyce E. Rader, Lee W. Fitzpatrick*, for appellant.
*Tisinger, Tisinger, Vance & Greer, J. Thomas Vance, Kenneth B. Crawford*, for appellee.